Jennifer Bess on behalf of Friends of Animals The FWS entered into agreements with multiple timber companies and the Oregon Department of Forestry that allow them to take threatened spotted owls by permanently destroying owl habitat, including known spotted owl sites, valuable nesting roosting habitat, and critical habitat. The permits authorized the take to start immediately and continue throughout the duration of the permit. Today I would like to first talk about the most striking problem here, that FWS failed to make the required finding that implementation of Safe Harbor Agreements were reasonably expected to result in an increase in the species population or enhancement of suitable habitat within the enrolled property. Then I'd like to address how FWS's arguments regarding testing a conservation strategy are completely without merit. Next, I'd like to discuss how FWS also erred in determining baseline conditions by, among other things, excluding habitat that was being used by northern spotted owls at the time of the agreements. And finally, I'd like to discuss how FWS violated NEPA. Starting with the most important and straightforward issue here, FWS did not make the findings required by law. Federal regulations mandate that before FWS issued these type of permits, it make a finding that implementation of the Safe Harbor Agreements is reasonably expected to result in a net conservation benefit, and that the duration of the permit is sufficient to provide the net conservation benefit. Moreover, there is only one definition of net conservation benefit that the court can use in this case. It is the definition that Fish and Wildlife Service provided in its final Safe Harbor policy. This policy was issued after formal notice and comment rulemaking procedures, and the federal regulations explicitly mandate compliance with this policy. If I may interrupt, is your argument predicated on the Safe Harbor policy having the force of law? That is, if it doesn't have the force of law, then does your argument, you know, falter? No, Your Honor. I do argue that the policy does have the force of law, and I will get to that. However, even if the court doesn't find that the policy has a force of law, it still must look at the definition in the policy. And I would like to talk about the Supreme Court's decision in Kaiser v. Wilkie where it indicates that an agency is not afforded deference unless the court determines that the regulation is genuinely ambiguous. And the court must use all the tools in its toolbox, the Supreme Court said, to determine if the regulation is truly ambiguous. And it is not restricted to looking at just the regulatory text alone. The Ninth Circuit has also emphasized this. And it must look at non-binding things such as legislative history, such as the purpose and structure of the act. So, here, when the Fish and Wildlife Service issued a formal policy that clearly includes a definition of net conservation benefit, the job for the court is very easy. That resolves any ambiguity. The meaning of the regulation is clear. And the Supreme Court said that if there's only one reasonable construction of the regulation, then a court has no business deferring to any other reading, no matter how much the agency insists that it would make more sense to defer to another reading. And, again, that's the Supreme Court in Kaiser v. Wilkie saying you really have to be careful before you defer to the agency. So, if the safe harbor policy is an interpretive rule, which is what the government's arguing, in other words, it doesn't have the force of law, can you explain how, putting that aside, you still should prevail? Yes, Your Honor. Because if you look at the legislative history, as the court is required to do under Supreme Court precedent, the Code of Federal Regulations, the final rule was published at the same time as a safe harbor policy. And the agency indicated the entire purpose of publishing these federal regulations was to implement the safe harbor policy. They also explicitly say in the federal regulations that compliance with the safe harbor policy is mandatory. So, this indicates that what the Fish and Wildlife Service was trying to do, the clear intent of net conservation benefit, is that it must enhance the species population and or increase suitable habitat within the enrolled property. By looking at that legislative history, by looking at the fact that Fish and Wildlife Service issued both of these at the same time, that it went through formal notice and comment period, the regulation, there's no way to read the regulation as ambiguous. There's one clear meaning, and that clear meaning is that Fish and Wildlife Service has to make a finding that this is reasonably expected to increase the species population and or enhance suitable habitat. Fish and Wildlife Service never made this finding. For that reason alone, the court must set aside the decision. And I want to kind of just emphasize that point that the Supreme Court said when you're looking to determine if a regulation is ambiguous, you are not restricted to binding policy. You are not restricted to the text of the regulation. Rather, the court should use all the tools in its toolbox to determine if the regulation is ambiguous. If we can get to this. If you look at the policy, we're assuming as force of law, we look at it. I understand your argument, the definition of net conservation benefit. I understand that argument. On the other hand, if you look within the policy, it does mention that there are some disputes. Some of the commenters had some questions about what net conservation benefit means. And the agency says a net conservation benefit may result from creating areas for testing and implementing new conservation strategies. And that seems to be what the government was doing here. So why is it under even if the policy applies here and has a force of law? Why isn't that? Why doesn't what the government did fall within that definition? Yes, Your Honor. There's two main reasons it doesn't follow in that definition. And the first is that this is not creating or establishing an area to test a conservation strategy. And I want to be abundantly clear about this. Fish and Wildlife Service referenced a barred owl removal experiment. However, the barred owl removal experiment did not authorize the take of any northern spotted owls. And it did not contemplate even the take of northern spotted owl habitat. To the contrary, this barred owl removal experiment references the recovery plan for the northern spotted owl. And the recovery plan makes very clear that any threats from barred owls must be addressed simultaneously with threats from habitat destruction. The recovery plan also indicates that if there is habitat loss, that will actually increase the threat from barred owls because now they're both going to be competing for the same habitat. And that's what's happening here. These safe harbor agreements allow the immediate take of habitat. So essentially they're saying we're going to kill a barred owl, we're going to shoot it out of this tree, and then we can immediately cut down the tree. That cannot be considered a conservation strategy by any means. That's a lose-lose situation for all barred owls. The other issue is that while the policy does mention testing conservation strategies may result in a net conservation benefit, that in no way excuses Fish and Wildlife Service for making the required finding that it is reasonably expected to result in an increase in the species population and or the enhancement of suitable habitat. It is certainly possible that a conservation strategy is reasonably expected to help that species. And that's the finding that is required here. It's notable to take this in the context of the Endangered Species Act, which is one of the strongest acts to protect threatened endangered species in our nation, and which only allows the take in very rare circumstances. So it's not an easy thing to say, oh, you're allowed to have a permit to take these species. And here the requirements say you need to make this finding that it's going to increase the species habitat or the suitable habitat or the population. I'm sorry, Your Honor. And another thing in the Safe Harbor Policy that really drives this point in is that the Safe Harbor Policy explicitly says that where a property owner is seeking the immediate take, this type of permit is not appropriate. And they mentioned that a couple times in the Safe Harbor Policy. But isn't a lot of your criticism questioning the efficacy of this experiment? And it seems like don't we have to be deferential if the government thinks this will give them information to see to protect the spotted owl? I mean, don't we have to be deferential? We can't really second guess their assessment of the potential benefits from this experiment. Your Honor, this court can only uphold the decision of the agency based on the agency's findings in the record. And here the agency never made the finding required by regulations and therefore no deference is allowed. The Supreme Court was abundantly clear that the court should not defer to an agency's action that conflicts with the regulations. And so no deference is allowed here. Another thing that I want to point out is the Fish and Wildlife Service is likely to say, you know, even if this wasn't testing a conservation strategy on the enrolled property, which it clearly was not, that it's somehow supporting an experiment that was happening elsewhere. Again, they still have not made the required finding about either experience. Moreover, courts have said that it's improper for the agency to factor in the actions of another party. So here the agency should not have looked at the barred owl removal experiment, which was happening on federal land, because the regulations require that the net conservation benefit result from implementation of the Safe Harbor Agreement. And Fish and Wildlife Service has made clear that the barred owl removal experiment would have proceeded regardless of the Safe Harbor Agreement. Therefore, implementation of the Safe Harbor Agreement was not necessary for the barred owl removal experiment, and the court shouldn't factor in the barred owl removal experiment, which is occurring on federal land. A really tiny question about the amount of acreage involved. Is it about 38,000 acres? Is that what you're talking about in terms of potential spotted owl habitat? Yes, Your Honor. And there are kind of two different challenges in here. So the acreage is a little bit higher when you consider another, the second permit of Roseburg. But if you're just looking at the Oregon coastal range area, it's a little over 30,000 acres where they're authorizing the take of spotted owls. So the total amount of spotted owl habitat is a little short of 10 million acres? Is that right? Like something like 9.7? I'm not sure off the top of my head what the total habitat is. All right, thanks. I won't diverge any further. But I do want to emphasize, like I said, brings up one more point, is that these permits are different than, for example, an incidental take permit. That these permits aren't for activities that just maybe won't cause any harm. These permits are for activities that are supposed to enhance the survival of the species, that are supposed to provide a net conservation benefit. And other types of permits where, you know, take may be allowed immediately would be an incidental take permit. But there's certain safeguards with those type of permits, such as offsetting the take by, you know, supporting or enhancing habitat in another area. And that's not happening here because Fish and Wildlife Service didn't issue one of those permits. Instead, they issued enhancement of survival permit, which is not appropriate in this circumstances. Next, I'd like to talk really quickly about baseline and that Fish and Wildlife Service is actually authorizing the condition of the property to be in a worse place than it was when it entered into these agreements by allowing the take of habitat where northern spotted owls currently existed at the time of the agreement. They simply said, oh, because these aren't resident spotted owls, you can take them, and they don't have any conservation value. There's no support for doing that in the safe harbor policy or the regulations. The Endangered Species Act protects all northern spotted owls, regardless of whether Fish and Wildlife Service deems them resident or nonresident. I do notice that I'm running low on time, and I would like to reserve some for rebuttal, Your Honors. All right, thank you, Counsel. We'll hear from the government. Yes, good morning. May it please the Court. Andrew Birney on behalf of the Fish and Wildlife Service. Judge Aiken correctly granted the service summary judgment on Friend's claims. I have some broader points I want to make, but I would like to just dive into a few of Ms. Beth's remarks, particularly this idea that was emphasized repeatedly that the service failed to make the required findings. I think it's helpful to actually discuss those findings and then discuss how those interact with the safe harbor policy. So probably the best place to look for those findings are just the service's findings accompanying the operative permit. So for the Weyerhaeuser permit, that's, I think, pages 813 to 815 of the excerpts of record, 905 to 908 for Roseburg, and then 179 to 181 for Oregon. So when you look at those findings, which I'll just summarize. What was the last one for Oregon, Counsel? 179 to 181. All right, thank you. Sure. So if you look at those findings, let's take the Weyerhaeuser one as an example. So the service does a couple of things. First of all, the service says, as set forth in 50 CFR 17.32C1, that's the Net Conservation Benefit Regulation, the permit is reasonably expected to provide a net conservation benefit by contributing to the recovery of the listed species, and the permit otherwise complies with the safe harbor policy. So that is the exact finding set forth in the regulation itself. And then the service goes on to explain in detail why. The service notes the threat posed by barred owls, citing correlational data. It notes the importance of the Weyerhaeuser land to the barred owl remover experiment because it's interspersed with federal lands. And the service then notes that it's unlikely that the areas in which the spotted owls might temporarily reoccupy as a result of the barred owl removal that the permit facilitates, that they would reoccupy at all in the absence of the permit. And the service goes on to find that the benefit of the information generated by the non-federal lands contribution, participation in the experiment, outweighs any incidental take that might occur. So we think that judgment is well supported and certainly reasonable, and it's consistent with the safe harbor policy. Judge Lee, turning to that policy for a second. Judge Lee, I think your question is exactly right. I mean, friends, about the comment to response five. Friends' entire argument is based on a single sentence in the definitional provision, in the definitional provision, which says contribute to an increase in population or a certain effect on habitat. But it goes on to say that a conservation benefit may contribute directly or indirectly to the recovery of a species. That's what the regulation says. And then goes on to say that benefits include establishing areas for testing new and innovative conservation strategies. And then in the response to the comment that Judge Lee quoted, they include that as a freestanding basis for a net conservation benefit. So I think there's two ways to look at this. You can look at the creating areas for testing and implementing new conservation strategies as a gloss on what it means for something to increase the population of a species. Or you can look at it as an independent basis for a safe harbor for a net conservation benefit finding. But under either standard, I don't think the safe harbor policy could possibly be clearer that exactly what the service is doing here can provide a conservation benefit. And on that regard, I'm not sure Friends really has any theory about what that testing language is actually doing within the policy. Testing by its very nature is only going to increase the numbers of a species indirectly by generating new information that can be used to inform conservation strategies. And the SHA policy is perfectly clear that that sort of indirect benefit is proper so long as it outweighs any harm, which the service plainly found was the case here. If I can ask a question about the policy, just a little kind of more preliminary question. I saw on the Federal Register there were some comments from the public. I mean, did it go through a notice and comment procedure under the APA? I mean, was it something informal? I just wanted to understand that a little bit more. It was subject to notice and comment, Judge Lee. And just to clarify, I mean, we think Judge Aiken was right that this is a mere interpretive rule that doesn't have the force of law for the reasons she said. The purpose is to ensure interagency consistency rather than to confer individually enforceable rights. But we acknowledge that that's not a major part of our argument, and we're more than happy for the court to decide the case on the assumption that the policy does apply. The service here found that the permits were consistent with the State Power Policy, and we think it's clear that they were. But to answer your question directly, yes, it did go through a notice and comment. Could a party have challenged that policy, you know, saying that it didn't comply with proper notice and comment? That's a good question. I think if it was an interpretive rule as we say that it was, that it's not a major part of our argument, probably not. I suppose the statute of limitations for such a challenge would have been six years, so it would have been long since passed. But I think our first level answer would probably be not, would be probably not. I'm not sure that's a question the court necessarily, I understand the question. I don't think it's something the court necessarily needs to get into here. On, if I could also just address, Ms. Best also said that the service is not actually creating and testing conservation areas. I mean, with respect, that's just wrong. That's exactly what the service is doing. The service effectuated the barred owl removal. As we point out in our brief, that the barred owl removal has already occurred. The service actually, on the service's website, has actually published the, at least at a high level, the results of that experiment of which these lands were part, and indicated that it will likely be used to inform future conservation efforts and management plans. Friends relatedly says in their brief, and I just want to clarify this, that barred owl survey data was not actually collected, or there's no provision, the service didn't have a right to collect the data. That's not correct. The service has pre-existing demographic survey data under the Northwest Forest Plan that it used both to inform baseline and non-baseline designations, and that it used to evaluate the results of the experiment. To be clear, that exists independent of the experiment, but it's, excuse me, independent of the permits. The service has the right to collect that data, but it's also referenced in the permits themselves. At excerpts of record, I think 494 for the Weyerhaeuser permit, and I believe 530 for the Roseburg permit. So the service plainly is engaged in testing, which is exactly what the Safe Harbor Policy contemplates. I want to just briefly address the critical habitat issue, which only applies, of course, to the Oregon permits. I didn't see Friends in their reply. Friends argued in their opening brief that there was, in fact, critical habitat for the non-Oregon permits. That's not correct. The permits were amended so that federal lands in which they had an easement don't apply. The incidental take permits don't encompass that. So this is really only an Oregon issue. Judge Cannelli, to answer your question, there's about 9.7 million total critical habitat for the Spotted Owl, and the critical habitat applicable that is theoretically subject to the Oregon permit is about 3,400. So the service made several points. So it's 3,400, not 34,000. 3,400 is the critical habitat. The broader point, the total possible suitable habitat. That's where you get the .04, that's where you get the four 100s of 1% figure, because that would be about 3,400 acres. That's right. So just to address the broader designation, I think the habitat issue is really only relevant to the Oregon permit for, I think, essentially two reasons. First of all, there is no critical habitat in the other two permits. But also, as the service noted, nothing prevents the non-Oregon permit holders, if the permits didn't exist, from harvesting that habitat as long as they don't actually take any Spotted Owls. So I think this habitat issue is really only an issue associated with the Oregon permit. And if you look at the service's analysis of the critical habitat issue, probably the best place to look is the relevant portion of the biological opinion. That's at Supplemental Excerpts of Record, I think, 208 to 212 is the relevant parts of the service's analysis. And the service says a few things. I'll just summarize here. First of all, it notes that it doesn't actually know that all 3,400 critical habitat acres will be harvested. But the service assumed, for the sake of its analysis, that all 3,400 acres would be. The service noted that this amounted to only 1.3% of the critical habitat on one subunit and 0.2% on another. And the service made a conclusion that given both this small number and the fact that these are interspersed scattered lands, this wouldn't appreciably diminish the value of suitable habitat. And the service made the same conclusion at the region-wide level where it's only 0.4% of the unit and then the 0.04% of the total habitat that Your Honor referenced. Just to make a legal point, though, in addition to the factual point, I think it's important to note that in analyzing this issue, under 50 CFR 402.02, the regulatory definition of destruction or adverse modification of suitable habitat is at the species level. What it says is that adverse modification occurs if there is an appreciable diminishment of critical habitat for the species as a whole, for its conservation purpose. The service made an express finding here that that was not the case, given both the characteristics of the land and the tiny amount of critical habitat at issue. And then in any event, the conservation value of the information to be provided by the non-federal lands in the experiment outweighed that. So we think that is a technical finding well within the source of the service's expertise, and I don't think there's any ground for disturbing that. Just want to make a brief point about the baseline versus non-baseline conditions. The service's determination that it would deem a site non-baseline if not a single resident spotted owl had been spotted in the area within three years or five years for the permit was well supported. It's consistent. There's nothing in the SHA policy that is inconsistent with that. It actually goes beyond the SHA policy, as we described in our brief. And I would just add that it was supported by relevant data. I think you can see that in the record. The service developed the baseline conditions in negotiations with the landowners, but it did not ultimately make a non-baseline condition, a non-baseline determination, unless it itself could determine that that determination was supported based on its surveyor's work or the preexisting demographic study arrangements it has under the Northwest Forest Plan that I just referred to earlier. So just briefly on the NEPA claims. I mean, we think it's clear that modification of the EIS was not required here. Just to make a few points on that, as we say in the brief, this was not unexpected. These non-federal lands were within the boundaries of the 2013 Record of Decision, and this does not expand the number of barred owls to be taken. That's governed by the MBTA Treaty. It is true, as Friend says and emphasizes in their reply brief, that, of course, the service could not take barred owls on the non-federal lands under the 2013 Decision Absent the Permits. That's the whole point of the permits in the first place. But as we point out in our brief, the service telegraphed that it was going to – and for many of the same reasons that we expressed, that the service concluded that the environmental effects of this were modest and would inure to the benefit of the spotted owl, the service could reasonably conclude that this was not significant new information. I see my time is running out. I'd like to just close with a broader point. I've made a lot of specific record points here, but I think I'd like to just make a broader point, which is that this is an unusual legal challenge in some respect. It's a challenge that Friends is certainly entitled to make, to be clear. But it's unusual in the sense that in a typical case in which a plaintiff asserts the rights or the interests of an endangered or threatened species, what you have is an agency action, the purpose of which is something other than species conservation, like approving a pipeline or a logging proposal or something like that, and the allegations that the agency failed to adequately consider effects to the species. Here, the spotted owl is the intended beneficiary of these permits. The service determined with respect to these permits that these permits were important to execute the experiment. The service previously found was vital to inform conservation efforts and future management plans for this threatened species. Counsel, you've exceeded your time, but I have a question that I wanted to ask you. Thank you very much. Opposing counsel said that under the incidental take of these permits, the holders of the permits can shoot an owl out of a tree to cut down that tree. Is that true? My understanding was that an incidental take was not supposed to be that intentional take. I'm not actually sure. I need to check the scope of the incidental take permits. That would be not intended to benefit the species if the recipients of these permits could just shoot an owl in order to harvest the tree. That would be the total antithesis of what the experiment is supposed to be. I'm disturbed that you are unequivocally saying that that's not included within the permits. Your Honor, what I'm not saying is not included in the permits. I just don't know off the top of my head whether the incidental take permits, whether that encompasses intentional take on the part of the landowners. I can provide that information to the court. I don't know. The point is, I guess two points about that that I'll just make quickly. I see my time has expired. The benefit was the landowner's participation in the experiment, which was providing this information. The second point I would make is that I don't think there's any information that this has actually harmed spotted owls in that way. The Service's published research as a result of this experiment indicates that compared to the control areas where barred owl removal has not taken place, and where spotted owl populations continue to decline quite dramatically, I think about 11 percent a year, within the treatment areas covered by these experiments, it has largely arrested the decline of spotted owls. I don't know the answer to that narrow question about whether the incidental take permits encompass intentional take, but I think either way the Service reasonably determined that the scope of the incidental take permits, that the drawbacks of that were far outweighed by the information to be generated. If it's an incidental take permit, isn't that totally the opposite of intentional take? Right. So that's why I'm not actually sure that this best characterization of what they can do is correct. And I don't know. I'm just reluctant to affirmatively say it's incorrect because I hadn't focused on the question of whether the scope of the incidental take permits for the nonfederal landowners encompasses intentional take. So I just don't know the answer. Where in the record would we look to see whether or not the incidental take permit allows intentional take? Where would we look in the record to find that? Can you find that right now? I can't find the page set. So I think where you would look, so the permits themselves as amended would be, I think, are at 659, 781, and 873. So could you turn there and look at those? Could you turn there and look at those to see if it includes intentional take? Your Honor, I can try. These are dense materials, so I don't know. Surely you know where the permits are. I know where the permits are, but in terms of the EAs and assessment. Well, I'm not talking about the EAs. I'm talking about the permits. So the terms of the permit should tell us whether or not intentional take is permitted. Right. I can certainly look for that information, Your Honor. Could you do that now? Sure. I'm just not sure I'm going to be able to find it. Well, you've told us where the permits are, so let's go to the permits. Okay. To me, that would make a real difference as to whether or not I would be willing to say that these permits are permissible, because if it allows the permit holders to shoot the owls out of the tree in order to harvest the tree, that would not be consistent with NEPA. So, Your Honor, I mean, I guess the only thing I can say about that, and I certainly fully acknowledge that this answer might not be helpful to the court, is, well, first of all, I just don't know the answer, but I don't think that whether or not… Why don't you know the answer if you can look at the permits? Are you telling us that the permits don't answer that question? Your Honor, I just don't know. I apologize. All right. Thank you. Rebuttal? Thank you, Your Honor. First, I would just like to take a quick second to clarify the issue that you were just discussing. What I'm saying is that the service can shoot a barred owl, and then the timber companies can immediately cut down the tree. Or, if the spotted owl was there, they don't need to shoot the spotted owl. The permit allows them to just cut down that tree, even if it's going to kill the spotted owl. That's the definition of incidental take, though. Yes. So, what I was referring to is that they can… In reference to, is this a conservation strategy, what's happening under these permits is that concurrently with Fish and Wildlife Service shooting barred owls, at the same time, timber companies are permanently destroying the habitat of northern spotted owls. That's not what you said originally. You said that the permit holder could shoot the owl without specifying that it was the shot, as opposed to the spotted owl. I'm sorry, Your Honor. I do want to clarify that. They're shooting the barred owls, and they're allowed to take spotted owls at any time, and they're allowed to take spotted owls immediately. I also just wanted to state that Fish and Wildlife Service Council tries to downplay the definition of what net conservation benefit means, saying it's just a single sentence. But this is the most important sentence in the policy. The purpose of this policy is to talk about and clarify what net conservation benefit means. And this policy is not interpretive. It has substantive obligations, because the federal regulations explicitly say that any applicant must submit a safe harbor agreement that complies with, quote, the requirements of the safe harbor policy. In addition, the federal regulations require that Fish and Wildlife Service make a finding that the safe harbor agreement complies with the safe harbor policy. So this is a substantive binding policy. I also want to address something that was a little misleading, that Fish and Wildlife Service argues that it's okay for them to indirectly or directly achieve a net conservation benefit. However, the terms indirectly and directly reference the recovery. These permits also have to contribute to the recovery of their species. So recovery means the point at which the species no longer needs to be listed. And that can happen directly or indirectly. However, the requirement that there be a net conservation benefit is just that. It must achieve a net conservation benefit. It must enhance suitable habitat within the enrolled property or increase the species populations. There's no provision that allows them to do that directly or indirectly. All right. Thank you, counsel. Thank you to both counsel for your helpful argument. We'll be in recess for 10 minutes. All rise.
judges: RAWLINSON, LEE, Kennelly